Filed 4/3/15  P. v. Wacker CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

FRITZ KARL WACKER,

    Defendant and Appellant.

E060244

(Super.Ct.No. BAF1300098)

OPINION

APPEAL from the Superior Court of Riverside County.  Mac R. Fisher, Judge. Affirmed.

Richard Glen Boire, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Randall Einhorn and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Fritz Karl Wacker guilty of attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] with the personal use of a firearm (§ 12022.53, subd. (b)), and assault (§ 245, subd. (a)(2)) with the personal use of a firearm (§ 12022.5, subd. (a)).  Defendant was sentenced to a total term of 15 years in state prison as follows:  the low term of five years for the attempted murder plus a consecutive term of 10 years for the firearm use enhancement; the sentences for the assault conviction and the associated weapon enhancement were stayed pursuant to section 654.

On appeal, defendant argues that his sentence constitutes a cruel and unusual punishment under the state and federal Constitutions.  He also asserts that if the issue is forfeited, his counsel was ineffective for failing to object to his 15-year sentence on the ground that it was cruel and unusual in violation of the state and federal Constitutions. We reject these contentions and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On February 15, 2013, defendant, who was then 89 years old and primarily confined to a wheelchair, was living with his fiancé, Magdalene Roberson, in Calimesa. Defendant had met Roberson through the Internet in May 2012, and by September 2012 she had moved into defendant's home.  Other than receiving disability payments, she had no other source of income during the time she was living with defendant.  Defendant

---

[1]  All future statutory references are to the Penal Code unless otherwise stated.

would give her money for household expenses. The previous day was Valentine's Day, and it appeared the relationship had been going well between the couple.

However, during the evening on February 15, 2013, there appeared to be tension between defendant and Roberson. At one point, defendant popped the balloons he had given her and asked Roberson, "[s]o where do we go from here?" Roberson did not respond and, at some point, told defendant that he was acting like a child. Roberson believed that defendant had been abused in the past and, as a result, whenever they had disagreements, defendant feared that she would leave him. Roberson would usually reassure defendant that she would not leave him, but this time she ignored defendant's question.

Later that evening, Roberson heard coyotes outside and went to the bedroom to get defendant's revolver, which he kept loaded on the floor by his bed.[2] Defendant asked Roberson if she came in to apologize. Roberson retrieved the revolver and went into the living room without answering him. Defendant went into the living room in his wheelchair and asked that she give him his revolver. Roberson did not want to give the gun to defendant, not because she was afraid of defendant, but because she had heard coyotes. After defendant demanded the gun several times, Roberson eventually gave the revolver to him. Defendant took the gun back into the bedroom with him.

Later, Roberson went into her walk-in closet in the bedroom. Defendant was sitting in bed. When Roberson exited the closet, she saw that defendant was now sitting

---

[2] Defendant had retired after 20 years as a correctional officer.

3

in his wheelchair, holding the revolver. As he extended the revolver at her, she thought that he was handing the gun to her. Instead, the revolver fired, and she fled from defendant out the bedroom, through the family room, and out of the home. She thought that the gun had accidentally discharged because when she had handled the gun on another occasion, it had discharged by itself. As she ran through the family room, she heard the gun discharge a second time.

Roberson ran to a neighbor's house, and the neighbor called 911. Defendant came out of his house. Roberson wanted to go and talk to defendant because she was not sure if the gun had misfired or if defendant had actually shot at her. The neighbor told Roberson, "no." The audio recording of the 911 call was played for the jury. Roberson informed the dispatcher that defendant had a gun; that he tried to shoot her with the gun; that the gun had "misfired"; and that she was concerned about defendant's welfare.

Riverside County Sheriff's deputies responded to the scene. When they entered the partially open front door of the home, they saw defendant sitting in a motorized wheelchair, and they shouted at defendant to show his hands. Defendant complied. No gun was seen on or near defendant. Defendant told the deputies, " 'I was expecting you guys' " and " 'I shot the bitch.' "

A search of the home revealed a gunshot hole in the ceiling of the kitchen and a bullet hole in the doorframe of the bedroom closet.[3] No expended bullet was found in the home. A revolver was found on a television stand in the home's front room; two empty

---

[3] A third bullet hole was found in the bedroom; however, Roberson testified that the gun had accidentally gone off on January 17, 2013.

4

bullet casings were in the revolver's cylinder, which indicated the revolver had been fired twice.

Defendant was interviewed after his arrest. That interview was recorded and played for the jury. Defendant stated that Roberson drove him "nuts," because she was a habitual liar, she yelled at him, and they argued a lot. He admitted to shooting at Roberson twice and intending to strike her when he fired the gun. He believed that if he shot and killed her, he would go to jail and not be alone.

II

DISCUSSION

Defendant contends that the sentence of 15 years constitutes a cruel and unusual punishment as applied to him. Specifically, he argues it is cruel and unusual under the circumstances of this case, including not only the fact that he was an 89-year-old man confined to a wheelchair, but also the fact that he had no criminal record, had worked for 20 years as a correctional officer before retiring, his behavior was aberrational, and because of his fear that Roberson, who was nearly 30 years his junior, was going to leave him.

Preliminarily, the People argue that defendant forfeited this contention by failing to raise it below. We agree. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)

However, defendant also contends that, if defense counsel forfeited this contention, that forfeiture constituted ineffective assistance of counsel. The People respond that this contention should be rejected because the sentence imposed was not

5

cruel and unusual and, even if counsel had objected, it is not reasonably probable defendant would have received a different sentence. Under these circumstances, however, the ineffective assistance of counsel argument requires little additional discussion. If the sentence did constitute a cruel and unusual punishment, there could be no rational tactical purpose for failing to raise the issue; moreover, the failure to raise it would necessarily be prejudicial. We conclude that we should reach the underlying cruel and unusual punishment issue, even if only under the rubric of ineffective assistance of counsel. (*People v. Norman* (2003) 109 Cal.App.4th 221, 229-230; *People v. DeJesus*, *supra*, 38 Cal.App.4th at p. 27.)

A. *State Constitutional Principles*

Prior to sentencing, the trial court here reviewed the probation report and defendant's sentencing memorandum. The court noted that because the jury found defendant personally used a firearm (§ 12022.53, subd. (b)) in the commission of the attempted murder, defendant was ineligible for probation. Although the court found the circumstances in mitigation outweighed the circumstances in aggravation, the court concluded that its sentencing discretion was limited by the applicable statutory sentencing provisions. After the court heard arguments from defense counsel and a statement in support of defendant from the victim, who desired that defendant be granted probation, the court denied defendant probation and sentenced him to a total term of 15 years in state prison as follows: the low term of five years for the attempted murder plus a consecutive 10-year term for the personal use of a firearm enhancement pursuant to section 12022.53, subdivision (b). The court explained that it was required to follow the

6

sentencing statutes; that it did not have unfettered discretion to impose any sentence the court deemed appropriate; and that the court had to follow the law and impose an authorized sentence based on the jury's findings.

Section 12022.53, subdivision (b), provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, *shall* be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply." (Italics added.) The commission of the offense of attempted murder is listed in section 12022.53, subdivision (a).

A trial court does not have the discretion under section 1385 to strike the section 12022.53, subdivision (b), enhancement. Section 1385 permits a judge, on his or her own motion, and in the furtherance of justice, to order an action to be dismissed. Section 12022.53, subdivision (h), however, expressly proscribes the application of discretion under section 1385 to strike a firearm enhancement promulgated under section 12022.53. Section 12022.53, subdivision (h), provides: "Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section." (See *People v. Felix* (2003) 108 Cal.App.4th 994, 999 (*Felix*) [firearm enhancement under § 12022.53 may not be stricken pursuant to § 1385].) Furthermore, section 12022.53, subdivision (g), provides "probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any person found to come within the provisions of this section."

7

Section 12022.53 was enacted for the purpose of imposing " ' "substantially longer prison sentences . . . on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime." ' " (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129.)  Although it is the Legislature's role to define crimes and proscribe penalties for them, all statutory penalties are subject to the constitutional prohibition against cruel or unusual punishments contained in article I, section 17 of the California Constitution.  (*People v. Dillon* (1983) 34 Cal.3d 441, 450 (*Dillon*).)  Such a violation occurs when a statutory punishment " 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*Id*. at p. 478; accord, *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).) "[A] punishment is impermissible if it is grossly disproportionate to the offense as defined or as committed, and/or to the individual culpability of the offender." (*Dillon*, at p. 450.)

Whether a punishment is cruel or unusual in violation of the California Constitution under the legal principles set forth in *Lynch* and *Dillon*, "presents a question of law subject to independent review; it is 'not a discretionary decision to which the appellate court must defer.' [Citation.]" (*Felix*, *supra*, 108 Cal.App.4th at p. 1000.)  The reduction of a sentence based on the determination it is cruel or unusual under the California Constitution " 'is a solemn power to be exercised sparingly only when, as a matter of law, the Constitution forbids what the sentencing law compels.' [Citation.]" (*Felix*, at p. 1000.)  Furthermore, such a reduction " ' "must be viewed as representing an exception rather than a general rule" ' " and " '[i]n such cases the punishment is reduced

because the Constitution compels reduction, not because a trial court in its discretion believes the punishment too severe.' [Citation.]" (*Ibid.*)

" 'Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17 [of the California Constitution], the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively, and unmistakably appears.' " [Citation.]' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 569.)

In *Lynch*, *supra*, 8 Cal.3d 410, the California Supreme Court identified three analytical "techniques" a court must use to determine whether a punishment is disproportionate to the crime: (1) the court considers the nature of the offense and the offender "with particular regard to the degree of danger both present to society"; (2) the court compares the punishment imposed with the punishments for more serious crimes in the same jurisdiction; and (3) the court compares the punishment imposed with punishments for the same crimes in different jurisdictions. (*Id.* at pp. 425-427; see *Dillon*, *supra*, 34 Cal.3d at pp. 479-482.) A punishment need not be disproportionate under all three techniques to violate the California Constitution. (*Dillon*, at p. 487, fn. 38.)

9

In assessing proportionality, courts must examine " 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' [Citation.]" (*Dillon*, *supra*, 34 Cal.3d at p. 479.) Factors surrounding the nature of the offense include the defendant's motive, the way the crime was committed, the extent of the defendant's involvement, the manner in which the crime was committed, and the consequences of his acts. (*Id.* at p. 479; *Felix*, *supra*, 108 Cal.App.4th at p. 1000; *People v. Wallace* (2008) 44 Cal.4th 1032, 1099.) Factors regarding the nature of the offender include his "age, prior criminality, personal characteristics, and state of mind." (*Dillon* at p. 479; see *Felix* at p. 1000.) "[A] punishment which is not disproportionate in the abstract is nevertheless constitutionally impermissible if it is disproportionate to the defendant's individual culpability." (*Dillon*, at p. 480.)

Here, imposition of the mandatory low term of five years plus the mandatory consecutive 10-year firearm enhancement term under section 12022.53, subdivision (b), did not constitute a cruel or unusual punishment, as it applied to defendant, in light of the circumstances of the offense and defendant's individual culpability. Defendant does not contend that his sentence imposes a facially unconstitutional punishment.

The sentence was not cruel or unusual in light of the nature of the charged offense. Here, defendant admittedly shot at the victim twice—once as she emerged from the bedroom closet while he was in close range to her, and again while she fled from the home. Deputies found two empty bullet casings in the cylinder of defendant's revolver, indicating the gun had been fired twice. When the deputies arrived, defendant immediately said that he had " 'shot the bitch.' " Later, when he was questioned by the

10

deputies, defendant again readily admitted to shooting at the victim twice, intending to strike her when he fired the gun. Although the victim was, and is, still concerned about defendant due to his advanced age and physical disability, the record shows defendant's actions, nonetheless, frightened the victim. Defendant engaged in violent conduct with a firearm and his motive was self-centered. Defendant may have been frustrated and feared being left alone, but those all-too-common flaws do not prove he was oblivious to the potential consequences of his actions.

In *Felix*, *supra*, 108 Cal.App.4th at page 1000, the defendant, who had threatened the victim with a firearm to commit a carjacking, unsuccessfully argued that the imposition of the section 12022.53 subdivision (b), 10-year enhancement term was cruel or unusual. The appellate court stated: "Although [the defendant]'s crime was not as violent as some armed carjackings, section 12022.53, subdivision (b) does not require extreme violence. This statutory provision punishes the perpetrator of one of the specified crimes more severely for introducing a firearm into a situation which, by the nature of the crime, is already dangerous and increases the chances of violence and bodily injury. We conclude nothing in the nature of the offense or how it was committed allows striking the mandatory enhancement as cruel or unusual." (*Felix*, *supra*, 108 Cal.App.4th at p. 1001, fn. omitted.)

Nor are we persuaded that the sentence is grossly disproportionate to defendant's individual culpability based on his personal characteristics. Here, defendant was 89 years old at the time of the offense and a retired correctional officer with the sheriff's department. As the probation officer noted, "defendant is a man who knows weapons"

11

and "understands the harm weapons can cause." He therefore was not "comparable to the unusually immature 17-year-old defendant in *Dillon*[, *supra*, 34 Cal.3d 441,] who panicked and shot and killed a man guarding a field from which the defendant and his companions had planned to steal marijuana." (*Felix*, *supra*, 108 Cal.App.4th at p. 1001.) Although defendant was in a wheelchair and may have feared being left alone at the time of the offense, the record shows he acted with a conscious disregard for human life and, in so doing, secured the revolver to use in its commission. After the victim took the loaded revolver defendant kept on the floor by his bed, defendant demanded the victim give it back. The victim gave the revolver back to defendant, and defendant retreated to the bedroom. The victim, sometime thereafter, went into the bedroom, where she found defendant on the bed, and then into the bedroom closet. As she emerged from the closet, defendant was sitting in his wheelchair with the revolver in his hand. He extended the revolver at the victim and fired at her. Defendant fired again, as the victim ran from him. The record thus shows his conduct was conscious, not spontaneous.

We are mindful of the circumstances in the record showing this attempted murder and assault were committed by an elderly man who generally lived an otherwise productive, crime-free life but developed a frustration with the victim and may have feared being left alone. (But see *Felix*, *supra,* 108 Cal.App.4th at p. 1001 ["The lack of a criminal record is not determinative in a cruel or unusual punishment analysis"].) It is sad that defendant, who had been a hardworking, law-abiding citizen, with stable employment and companionship for the majority of his life, would resort to such crimes out of a purported frustration or fear. However, as the probation officer noted, although it

12

was "unclear what occurred the night he attempted to murder [the victim]," defendant admittedly stated that he had " 'shot the bitch and did not mean to miss.' At that moment, his ideals of being a pacifist and against violence went by the wayside. He took advantage of his relationship with [the victim], believing he could kill her and remain free of consequences." We note that defendant apparently regretted his actions, and the victim believed defendant should be released from jail.

A comparison of defendant's sentence in this case with sentences imposed for more serious crimes also does not support a finding that defendant's sentence is cruel and unusual. The Legislature has concluded that crimes committed with a gun are inherently serious and warrant special scrutiny. "Section 12022.53 as a whole represents a careful gradation by the Legislature of the consequences of gun use in the commission of serious crimes. The section is limited, in the first place, to convictions of certain very serious felonies. The statute then sets forth three gradations of punishment based on increasingly serious types and consequences of firearm use in the commission of the designated felonies: 10 years if the defendant merely used a firearm, 20 years if the defendant personally and intentionally discharged it, and 25 years to life if the defendant's intentional discharge of the firearm proximately caused great bodily injury." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 495, fn. omitted.) Thus, simply comparing the sentence in this case and sentences for hypothetical crimes committed without the use of

13

a gun is not helpful to the analysis, and it does not support a finding that the sentence is unconstitutional.**4**

Notwithstanding the sad circumstances surrounding defendant's conduct, the fact remains he personally used a loaded firearm to commit the attempted murder. A sentence of 15 years was not grossly disproportionate to defendant's crimes, regardless of his age. Defendant was the direct perpetrator; he had the intent to kill; and he used a firearm. "Life sentences pass constitutional muster [even] for those convicted of aiding and abetting murder, and for those guilty of felony murder who did not intend to kill. [Citations.] Additionally, a sentence enhancement of [10] years . . . is not disproportionate to a violation of Penal Code section 12022.53; the Legislature has determined that a significant increase in punishment is necessary and appropriate to protect citizens and deter violent crime. [Citations.]" (*People v. Em* (2009) 171

---

**4** Defendant does not argue that his sentence is cruel and unusual when compared to punishments for the same crimes in different jurisdictions. Nonetheless, we note that several states impose discretionary terms comparable to California's mandatory enhancement, without requiring that the firearm use resulted in injury. (See, for example, Del. Code, tit. 11, §§ 1447A, subds. (a), (b), 4205, subd. (b)(2) [discretionary additional term of two-25 years]; Neb. Rev. Stat. §§ 28-1205, subds. (2)(b), (3), 28-105, subd. (1) [additional term of one-50 years, consecutive]; Nev. Rev. Stat. Ann. §§ 193.165, subd. 1, 200.030, subds. 4(b), 5(b) [additional consecutive term equal to term of imprisonment for principal offense; first degree murder punished at a minimum by definite term of 50 years, second degree by minimum definite term of 25 years].)

Moreover, that "California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' [Citation.] Otherwise, California could never take the toughest stance against . . . any . . . type of criminal conduct." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.)

14

Cal.App.4th 964, 972-973.)  We cannot say the California Constitution compels the reduction of this sentence.

      B.    *Federal Constitutional Principles*

Under the Eighth Amendment, "[a] gross disproportionality principle is applicable to sentences for terms of years." (*Lockyer v. Andrade* (2003) 538 U.S. 63, 72.)  Outside the death penalty context, however, " 'successful challenges to the proportionality of particular sentences have been exceedingly rare.' [Citation.]" (*Ewing v. California* (2003) 538 U.S. 11, 21.)  For example, a defendant can constitutionally be sentenced to life in prison without the possibility of parole for possession of 672 grams of cocaine. (*Harmelin v. Michigan* (1991) 501 U.S. 957, 961, 990-994; see also *id*. at pp. 1008-1009.)  Further, in *Ewing v. California*, at pages 20 and 21, the United States Supreme Court held that a sentence of 25 years to life for stealing three golf clubs was not a cruel and unusual punishment under the Eighth Amendment.  A fortiori, a 15-year sentence is permissible for attempted murder with the personal use of a firearm.  In sum, federal precedent does not preclude the imposition of an indeterminate life sentence on defendant.  When those holdings are compared to the facts of this case, further consideration of defendant's argument under the Eighth Amendment is unnecessary.

We therefore conclude that defendant's trial counsel did not render ineffective assistance by failing to raise cruel and unusual punishment below.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                                          P. J.

We concur:

HOLLENHORST
                    J.

McKINSTER
                    J.